NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

PENNY G.,
*Appellant,*

*v.*

N.G., H.G.,[1]
*Appellees.*

No. 1 CA-JV 17-0432
FILED 2-15-2018

Appeal from the Superior Court in Yavapai County
No. P1300JD201200061
The Honorable Anna C. Young, Judge

**REVERSED; REMANDED**

COUNSEL

Robert D. Rosanelli, Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Law Office of Florence M. Bruemmer, PC, Anthem
By Florence M. Bruemmer
*Counsel for Appellee Guardian ad Litem*

---

[1]     On the court's own motion, it is ordered amending the caption in this appeal as reflected in this decision.  The above-referenced caption shall be used on all further documents filed in this appeal.

---

## MEMORANDUM DECISION

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Jennifer M. Perkins joined.

---

J O H N S E N, Judge:

**¶1**          Penny G. ("Mother") argues insufficient evidence supports the superior court's order terminating her parental rights to her two children. We reverse and remand the severance order.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**          Mother gave birth to twin girls on January 20, 2016.[2]  The twins were born about one month prematurely and had been exposed in utero to oxycodone, which had been prescribed to Mother.  When the twins left the hospital, the Department of Child Safety ("DCS") placed them with foster parents.  DCS filed a dependency action the next week; Mother began submitting samples for drug testing on January 29.

**¶3**          Stephen Gill, Ph.D., performed a psychological evaluation of Mother on April 14, 2016.  Gill concluded Mother had several substance-abuse disorders in reported remission, as well as Bipolar Disorder, Attention Deficit Hyperactivity Disorder, Post-Traumatic Stress Disorder, antisocial personality traits and an anxiety disorder.  On April 26, the superior court found the twins dependent as to Mother on the grounds that she had neglected the girls because of substance abuse, was unable to discharge her parental responsibilities due to mental health issues and kept an unfit home.  DCS referred Mother for individual counseling, substance-abuse assessment, behavioral-health intake, parent aide, parenting classes, psychiatric evaluation, urinalysis testing and transportation.

**¶4**          Mother enrolled in a vocational rehabilitation program in August 2016 and began working toward a general equivalency diploma. She also regularly attended her counseling sessions: According to a letter from her therapist dated October 18, 2016, Mother had attended 16 of 17

---

[2]      We view the facts and draw all reasonable inferences in the light most favorable to upholding the superior court's order.  *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 13 (App. 2002).

therapy appointments and showed progress by "reducing her own perceived victimization and focusing on the overall best for her children." At a report and review hearing on October 18, after hearing that Mother's drug tests were consistently negative, the court allowed Mother to begin to give the twins breast milk during their visits. Gill evaluated Mother again on November 3 and concluded that, although she still suffered from depression and anxiety, her "stability is greatly increased since she was first seen" and she had "clearly worked very hard to stay sober."

¶5　　　　In late 2016, the twins, still in foster care, began experiencing bouts of "explosive" "recurrent diarrhea" that occurred after their regular visits with Mother. On March 28, 2017, the superior court ordered that Mother's visitations would occur on three consecutive days each week, allowing DCS discretion to increase the amount of her unsupervised visiting time. The twins' diarrhea persisted, flaring up only after their contacts with Mother, and the problem grew to the point that a pediatrician diagnosed the twins with "Failure to Thrive" because of their inability to gain weight.

¶6　　　　On April 26, the twins' guardian ad litem ("GAL") filed a motion to suspend Mother's visits for three weeks, asserting the twins continued to experience diarrhea after their visits with Mother. The court granted the motion that same day. A week later, at the next regularly scheduled report and review hearing, DCS recommended the case plan be changed to severance and adoption, and the superior court ordered DCS to file a motion for termination. DCS's subsequent motion for termination alleged neglect, mental illness and 15 months' time-in-care. The termination hearing was set for August 14, 2017.

¶7　　　　Meanwhile, according to medical records dated May 18, three weeks after the court suspended Mother's visits with the twins, the diarrhea had ceased and they had begun to gain weight. As a result, their pediatrician suggested that the twins' contacts with Mother were "psychosocial stressors" that had caused the diarrhea and resulting failure to thrive.

¶8　　　　On June 22, Mother completed her fifth successful substance-abuse education course, with the supervisor noting she "fully participates in the classes and is a positive influence on her peers." Mother took her final recorded drug test on July 26, 2017; other than one positive test for alcohol and several diluted tests early in the dependency, each of her drug tests since the commencement of the dependency registered negative for each substance tested.

¶9 At DCS's request, Dr. James Thal, Ph.D., performed a best-interests evaluation on June 23. Thal reviewed various DCS records and reports, the record of the twins' visit to the pediatrician on May 18, and the psychological evaluations Gill performed on April 14 and November 3, 2016. He also interviewed Mother and the foster parents and observed the twins with their foster parents and with Mother. In the section of his report labeled "conclusions," Thal wrote:

> The interruption of visits with the mother has had a salutary effect on the children, suggesting that the twins primarily have a distressed, rather than a healthy and nurturing bond with their mother. Their pediatrician reports, and the foster parents concur, that the children's steady growth patterns have been re-established, seemingly lending strong support to the contention that the mother's impact on her children, despite her best efforts, have been unfavorable. This examiner's findings are consistent with that supposition.

> It is readily apparent that the children are most strongly bonded to their foster parents, their primary caregivers for virtually all of their lives. It is also apparent that the children have a relationship with their mother as well . . . . Nonetheless, it is this examiner's opinion that the children's best interest would be served by affirming their placement through severance and adoption with the current foster parents. It would be needlessly risky to disrupt [the girls'] well-established bonds with their foster parents. That lesson seems to have been clearly illustrated by the recent crisis involving the children's weight, growth, and failure to thrive.

> Additionally, [Mother] has a long history of significant personal, social, and emotional problems which have been manifested in severe mental illnesses and significant substance use. She carries multiple diagnoses and, while her efforts are truly commendable, this is a client who is reporting a relatively brief period of abstinence from drugs. The mother's resources are quite limited and the challenges of caring for twin toddlers are not unsubstantial. The client's history appears to be one of not responding well to stressors though, again [Mother] is functioning reasonably well at the present time. The mother clearly loves her children and her efforts at bettering herself are impressive and commendable. However, it cannot be concluded that the children, given their

4

unique needs, can be successfully parented by [Mother] at this
time or in the foreseeable future.

¶10 At the pretrial conference on August 1, DCS withdrew its
motion for termination. The record does not contain a transcript of the
proceeding, but the court's minute entry described DCS's explanation as
follows:

> The original motion for termination of parental rights was
> filed in good faith, but after further review the Department
> determined it would be in the children's best interests to give
> the mother more time to attempt to reunify because the
> mother has been compliant with her services such as UAs and
> engaging in her classes and other services. She has just fallen
> short of the 15 month mark of where the Department would
> like for her to be. Given additional time, she could reach that
> mark.

Upon hearing that DCS was withdrawing its termination motion, the GAL
moved orally to be substituted as the moving party, and the court granted
the motion. Mother and the GAL then agreed to a "paper trial," at which
Mother would waive her appearance. Having withdrawn its termination
motion, DCS asked for leave to have a therapeutic pediatrician review the
twins' medical records and Mother's psychological evaluation; the court
responded that such a review did not require a court order.

¶11 In a written motion filed August 10, DCS again raised the
issue of further analysis of the medical records and Mother's psychological
evaluations; DCS moved for a 45-day continuance to allow it to obtain
additional documents for use at the approaching "paper trial." DCS argued
that additional analysis was required "to confirm that the result of these
proceedings is in keeping with the best interests of the Children."
Specifically, DCS asked for time to consult with a psychologist to ensure
that Thal's best-interests analysis "was not too heavily influenced by the
pediatrician's failure to thrive diagnosis and to consult with a PhD
regarding visits between Mother and Children." On August 11, before
either of the other parties responded, the court denied the DCS motion
without explanation.

¶12 At the start of the termination trial on August 14, Mother's
attorney moved for a continuance to allow the additional assessments DCS
had proposed, arguing "there's more information needed to get a good
picture of what's going on before we proceed with a severance trial." Asked

for their positions about a continuance, DCS supported the request and the GAL said she had no objection. Nevertheless, the court denied the motion, reasoning that DCS and Mother had had sufficient time after issuance of the Thal report on June 23 to seek additional analysis. At the ensuing trial, the court heard only one witness, Mother's DCS case manager, who testified that Mother was "no longer benefitting" from parenting skills classes, that Mother had shown an ability and willingness to provide for the twins, and that Mother has "followed through with all of her services."

¶13 After taking the matter under advisement, the superior court issued an order terminating Mother's rights as to both twins based on all three alleged grounds, and also found severance was in the girls' best interests. Mother timely appealed, and we have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") sections 8-235(A) (2018), 12-120.21(A)(1) (2018), and -2101(A)(1) (2018).[3]

## DISCUSSION

### A. General Principles.

¶14 The right to custody of one's child is fundamental but not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The superior court may terminate a parent-child relationship upon clear and convincing evidence of at least one of the statutory grounds set forth in A.R.S. § 8-533(B) (2018). *Id.* at 249, ¶ 12. Additionally, the court must find by a preponderance of the evidence that termination is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).

¶15 Mother does not contest the superior court's finding that termination would be in the best interests of her daughters, but argues insufficient evidence supported the court's conclusion that the GAL had offered sufficient evidence to satisfy the three statutory grounds for termination. "The fundamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Thus, a showing that a natural parent is not the "best" parent is insufficient to terminate the parent's rights. *See Maricopa County Juv. Action No. JS-6831*, 155 Ariz. 556, 558 (App. 1988).

---

[3] Absent material revision after the relevant dates, we cite a statute's current version.

**¶16**        We review a termination order for an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). The superior court abuses its discretion if it commits an error of law. *Schickner v. Schickner*, 237 Ariz. 194, 197, ¶ 13 (App. 2015). Because the superior court is in the best position to "weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings," we will accept its findings of fact unless no reasonable evidence supports them. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

## B.    Neglect.

**¶17**        A parent's rights may be terminated based on clear and convincing proof that "the parent has neglected or wilfully abused a child. This abuse includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child." A.R.S. § 8-533(B)(2). The superior court found Mother neglected the twins based on evidence that (1) the girls were "born substance exposed due to Mother's use of prescription opiates during pregnancy" and (2) the girls' diarrhea stopped and they began to gain weight after the superior court ended Mother's visits. But neither of these conclusions establishes neglect.

**¶18**        As for the court's first finding, neglect may be established upon proof of a "determination by a health professional that a newborn infant was exposed prenatally to a drug or substance listed in § 13-3401 and that this exposure was not the result of a medical treatment administered to the mother." A.R.S. § 8-201(25)(c) (2018). The twins were born under the influence of oxycodone, which is among the drugs listed in the neglect statute. *See* A.R.S. § 13-3401(21)(dd) (2018). But the only evidence in the record is that Mother was prescribed oxycodone at a constant rate of about one tablet per day from October 2015 through the end of January 2016; Mother's drug tests were negative throughout the dependency. Accordingly, in the absence of any evidence that the twins' exposure to oxycodone "was not the result of a medical treatment administered" to Mother, the court erred by finding neglect based on this ground. *See* A.R.S. § 8-201(25)(c).

**¶19**        Turning to the second basis for the court's finding of neglect, such a finding may be made when a parent is unable or unwilling "to provide [the] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a). The court here found Mother neglected the twins because "the children suffered from diarrhea

after being with their Mother," and after the "pediatrician recommended Mother's visits stop . . . the children's diarrhea stopped and they began to gain weight at a satisfactory rate."

¶20　　　Failure to thrive risks harm to a child's health or welfare. *See* A.R.S. § 13-3623(F)(4) (2018) (defining "[p]hysical injury" as including "failure to thrive"). The record before the superior court, however, does not contain sufficient evidence to support the conclusion that Mother caused the twins' diarrhea and resulting failure to thrive.

¶21　　　The court based its finding on reports of two visits the twins made to the pediatrician, the first on April 25, 2017, and the second on May 18, 2017. In the April record, the pediatrician wrote that the girls' repeated bouts of diarrhea were of an "unknown etiology," and that the twins had "normal labs," "negative celiac testing and negative food allergy panel." The pediatrician also recorded that one of the girls "did seem to improve some when dairy was avoided." The pediatrician observed that it was doubtful that the diarrhea was caused by infection, and concluded, "At this point, I feel we must consider psychosocial stressors as cause." The pediatrician added, "Perhaps the ongoing back and forth [of visits between Mother and the foster parents] or just visit [sic] alone are very stressful for [the child] resulting in [failure to thrive] and diarrhea." When the girls visited the pediatrician in May, it had been three weeks since their last visit with Mother, and their diarrhea had ceased. From that, the pediatrician seemed to conclude that stress from visits with Mother had caused the diarrhea, writing, "I feel that the results of these last 3 weeks proves that visitations with biological mother are NOT in the best interest of this child. . . . The girls are now thriving and doing extremely well [so] re-introducing that stressor may have devastating consequences."

¶22　　　The medical records in evidence do not reflect the results of any tests or analysis supporting the court's conclusion that Mother was doing something during her visits to cause the girls' diarrhea. After the visits ceased and the twins began gaining weight, the pediatrician simply assumed that Mother was the cause of the diarrhea without recommending any further tests or attempting to explain why diarrhea of unknown etiology began and ended as it did. The pediatrician earlier had recommended to DCS and the twins' foster parents "that a strict stool diary should be kept." The record contains no evidence that the pediatrician's recommendation was pursued. More to the point, the pediatrician did not testify at the termination trial, and the GAL did not offer any medical opinion to a reasonable degree of medical certainty or probability that Mother was causing the girls' diarrhea. *See In re MH 2007-001236*, 220 Ariz.

160, 169, ¶ 29 (App. 2008) (clear and convincing evidence of medical issue requires "evidence expressed to a reasonable degree of medical certainty or probability"); *State v. Renforth*, 155 Ariz. 385, 387 (App. 1987) ("The clear and convincing standard is reserved for cases where substantial interests at stake require an *extra measure of confidence* by the factfinders in the correctness of their judgment, though not to such degree as is required to convict of crime.") (emphasis added).

**¶23** Although *post hoc ergo propter hoc* ("after this therefore because of this") may constitute some evidence of causation, under these circumstances, proof of causation requires more than supposition. "Reasoning post hoc, propter hoc is a recognized logical fallacy, a non sequitur. But sequence of events, plus *medical proof* of possible causal relation, may amount to proof of probable causal relation, in the absence of evidence of any other equally probable cause." *Breidler v. Indus. Comm'n*, 94 Ariz. 258, 262 (1963) (alteration and emphasis in original omitted and emphasis added) (quoting *Charlton Bros. Transp. Co. v. Garrettson*, 51 A.2d 642, 646 (Md. 1947)); *Hackworth v. Indus. Comm'n*, 229 Ariz. 339, 344-45, ¶ 16 (App. 2012) ("This point of logic [that *post hoc* is a fallacy] is well accepted in our case law.").

**¶24** Finally, even accepting the validity of the pediatrician's conclusion that the twins' diarrhea was caused by stress from their visits with Mother, the court erred by failing to consider whether that stress could be remediated short of severing Mother's parental rights. In seeking a trial continuance, DCS explained it wanted to obtain an opinion from a psychologist about the visitation issue. *See* ¶ 11 *supra*. Such evidence might have been directly relevant to resolving the children's stress, if indeed that was the cause of their failure to thrive.

## C. Mental Illness.

**¶25** The superior court also found the GAL had proven by clear and convincing evidence that Mother is unable to discharge her parental responsibilities because of her mental illness. The court relied on two reports for this conclusion: Gill's psychological evaluation of Mother in November 2016 and Thal's best-interests assessment of the twins in June 2017. Neither report reasonably supports the court's finding.

**¶26** Termination of a parent-child relationship because of mental illness requires proof that "the parent is unable to discharge parental responsibilities because of mental illness . . . and there are reasonable grounds to believe that the condition will continue for a prolonged

indeterminate period." A.R.S. § 8-533(B)(3). A showing of mental illness, by itself, is not enough. *Maricopa County Juv. Action No. JS-5209 & No. JS-4963*, 143 Ariz. 178, 184 (App. 1984). A movant also must establish by clear and convincing evidence that the parent's "mental illness or mental deficiency is such that it prevents the parent from discharging parental responsibilities. Further, there must also be evidence to support a finding that the illness is so severe and substantial that it will continue for an extended and indefinite period of time." *Id.*

¶27 The superior court cited Gill's November 2016 psychological evaluation of Mother as evidence that "Mother has been diagnosed as suffering from a depressive [dis]order and an anxiety disorder." Although Gill concluded in November 2016 that Mother suffered from depression and anxiety, he did not conclude that those diagnoses would prevent Mother from parenting the twins. In his November 2016 report, Gill noticed marked improvements in Mother's outlook and mental health during the seven months after he first saw her in April 2016: "her stability is greatly increased since she was first seen on 4/14/16. She has clearly worked very hard to stay sober and is learning about sober parenting and living a sober lifestyle over time." And, contrary to the court's finding, Gill also opined in November 2016 that if Mother "successfully commits to and completes services provided for her by [DCS] to stay sober and create a healthy and sober lifestyle, she will likely be able to discharge her parental responsibilities." *See Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007) (relevant circumstances supporting severance are those circumstances existing at the time of the severance trial).

¶28 The court also cited as evidence Thal's opinion that "it cannot be concluded that the children, given their unique needs, can be successfully parented by [Mother] at this time or in the foreseeable future." Thal, however, was not retained to perform a psychological evaluation of Mother; nor, according to his report, did he do so. Thal was retained instead to perform a best-interests assessment of the twins, specifically addressing five questions:

> 1. Given the children's current age, emotional and behavioral functioning, and the children's history of abuse, neglect, or maltreatment and the parent's ability/inability to meet the children's needs, is severance and adoption the most appropriate permanent plan for the children?
>
> 2. Given the children's current age, emotional and behavioral functioning, and the children's history of abuse, neglect, or

maltreatment and history of placements in this case, is it in the best interests of the children to move them . . . to an alternative placement (for example, moving the children from a foster home to a relative or from one relative to another)?

3. What is the nature and/or quality of the attachment of the children to their siblings/parents/caretaker/significant other?

4. Given the children's current age, emotional and behavioral functioning, and the children's history of abuse, neglect, or maltreatment and history of placements in this case, is it in the best interests of the children to move them . . . to an alternative placement (for example, moving the children from a foster home to a relative or from one relative to another)? Are the children showing symptoms of attachment issues? If so, what are the recommended interventions?

5. Are visits with the mother in the best interest of the children?

¶29　　　　After reviewing the records, interviewing Mother and the foster placement and observing the children with them, Thal concluded that "severance and adoption appears to be the permanency plan which is in the children's best interests." But Thal's report did not address Mother's contemporaneous mental health, let alone its possible effects on her ability to discharge her parental responsibilities, the severity of any mental health issues Mother faced, or how long they would last.

¶30　　　　Termination based on mental illness requires evidence that the parent "is unable to discharge parental responsibilities because of mental illness." The sentence in Thal's report the court relied upon came at the end of a long paragraph in which Thal began by noting that Mother had a "long history of significant personal, social, and emotional problems which have been manifested in severe mental illnesses and significant substance use." Thal then observed that Mother's "resources are quite limited" and noted (incorrectly, based on the record in the superior court) that Mother had "a relatively brief period of abstinence from drugs." Before concluding with the sentence the superior court cited, Thal wrote that Mother was "functioning reasonably well at the present time. The mother clearly loves her children and her efforts at bettering herself are impressive and commendable." In short, Thal did not opine that Mother would not be able to successfully parent the children *because of mental illness*. Instead, he

11

apparently came to that conclusion based on a wide variety of circumstances he understood to be present with Mother.

**¶31** Furthermore, the psychological reports on which Thal relied (from Gill's April and November evaluations) do not support his observation that Mother suffered from "severe mental illnesses" that would undermine her ability to parent. Gill's November report in particular concluded it was likely that Mother would be able to successfully parent the children if she remained committed to services and sobriety. *See* ¶ 27 *supra*. The record shows that Mother's drug tests were uniformly negative from the time of Gill's November report through the severance trial, and the DCS case manager testified that Mother did everything DCS asked of her, even after DCS moved to sever her parental rights. In the absence of any evidence that Mother had not remained committed to services and sobriety, and the presence of evidence to the contrary, the only psychological evaluation before the court at the termination trial concluded Mother likely would be able to parent the children.

**¶32** In sum, the record does not reasonably support the superior court's finding that Mother's mental illnesses were so severe and substantial that they would persist for extended and indefinite periods of time. Nor was there reasonable evidence that Mother's mental illnesses prevented her from discharging her parental responsibilities. Gill did not render such an opinion, and in fact opined to the contrary. Thal was not retained to perform a psychological evaluation of Mother and did not do so. His best-interests report, to the extent it touched on Mother's mental state, contradicted the most recent report of the psychologist who twice evaluated Mother.

### D. 15 Months' Time-In-Care.

**¶33** Termination based on 15 months' time-in-care requires clear and convincing evidence that "the child[ren are] being cared for in an out-of-home placement," the children have "been in an out-of-home placement for a cumulative total period of fifteen months or longer," DCS "has made a diligent effort to provide appropriate reunification services," "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). The "circumstances which cause the child to be in an out-of-home placement" are those that exist at the time of severance. *Marina P.*, 214 Ariz. at 330, ¶ 22.

¶34 Mother does not dispute that the twins were in an out-of-home placement for 15 months or longer; nor does she suggest that DCS failed to provide appropriate services. Instead, Mother argues there is no reasonable evidence to support the superior court's conclusion that she will be unable to exercise proper and effective care and control of the twins in the near future.

¶35 On this point, the superior court relied entirely on Thal's statement that "it cannot be concluded that the children, given their unique needs, can be successfully parented by [Mother] at this time or in the foreseeable future." For the reasons stated above, however, Thal's statement is insufficient to constitute clear and convincing evidence that "there is a substantial likelihood that the parent will not be capable of exercising proper and effective" parental control in the near future. A.R.S. § 8-533(B)(8)(c).

## CONCLUSION

¶36 For the foregoing reasons, insufficient evidence supports the superior court's order severing Mother's parental rights. Accordingly, we vacate that order and remand to the superior court for proceedings consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED: AA